Filed 12/30/13  Nickerson v. Scripps Health CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DARLENE NICKERSON,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>SCRIPPS HEALTH,<br><br>        Defendant and Respondent. | D062538<br><br><br>(Super. Ct. No. 37-2010-00093409-CU-PO-CTL) |


        APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Affirmed.


        Law Offices of Carolin K. Shining and Carolin K. Shining for Plaintiff and Appellant.

        Higgs, Fletcher & Mack, John Morris, William M. Low, Margaret E. Mangin and Loren G. Freestone for Defendant and Respondent.

Darlene Nickerson, as successor-in-interest to her deceased husband Glenn Nickerson,[1] appeals the judgment dismissing her second amended complaint against Scripps Health (Scripps). Darlene alleged Scripps violated the Elder Abuse and Dependent Adult Civil Protection Act (the Act; Welf. & Inst. Code, § 15600 et seq.) and committed willful misconduct in connection with the medical care and treatment it had provided to Glenn. On Scripps's demurrer, the trial court ruled Darlene had not alleged conduct that constituted a violation of the Act or willful misconduct (as distinguished from professional negligence) and sustained the demurrer without leave to amend. We affirm.

## I.

## FACTUAL BACKGROUND

Because this case comes to us after entry of a judgment based on the sustaining of a demurrer, we accept as true the material allegations of Darlene's pleadings. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 7.) According to her second amended complaint, the following events led to the death of Glenn:

In January 2007, Glenn became disabled in an automobile accident and could not move his legs. He also suffered from diabetes and end-stage renal disease, for which he began peritoneal dialysis in December.

---

[1] Because Darlene and Glenn have the same last name, we use their first names for brevity. In so doing, we intend no disrespect or undue familiarity.

2

Throughout 2008, Glenn gained weight, experienced high blood sugar levels, and suffered periodic bouts of peritonitis. He and Darlene therefore decided to switch from peritoneal dialysis to hemodialysis. In December, Glenn underwent surgery to create an arteriovenous fistula in his right forearm to be used for hemodialysis.

On January 27, 2009, Glenn was admitted to Scripps's hospital with a five-day history of progressive generalized weakness, elevated white blood cell count, decreased appetite, and weight loss. At the time of admission, Glenn had severe swelling of his lower limbs and cellulitis at the site of the arteriovenous fistula. He was "essentially bed bound" but had no pressure ulcers or other sores or wounds. Although Glenn was assessed upon admission as being at extremely high risk for skin breakdown, not until two days after admission did his chart indicate he was being turned every two hours, and he was not provided a bariatric bed until February 11. By that time, pressure ulcers had developed on his left heel and buttocks.

Glenn also had other problems during the first two weeks of his hospital stay. Scripps did not have the peritoneal dialysis equipment or supplies that Glenn used at home, the nurses had little or no experience with that type of dialysis, and they did not time the fluid exchanges properly. The dialysis routine was therefore "inconsistent" until proper supplies were finally obtained at the insistence of Darlene and one of Glenn's physicians. Glenn also received excessive amounts of morphine, which induced delirium and loss of appetite. Darlene tried to contact the hospitalist about this, but he did not return her calls the same day. When they eventually spoke, Darlene told the hospitalist Glenn seemed unresponsive and needed to be more active in order to get to rehabilitation.

3

Over the first three months following his admission to Scripps's hospital, Glenn suffered several setbacks. He developed aspiration pneumonia in mid-February 2009 and had to be transferred to the intensive care unit for three weeks. In March, Glenn was diagnosed with calciphylaxis,[2] which contributed to his wounds and required placement of another access for hemodialysis. By early April, the pressure ulcer on his buttocks had become so large that subcutaneous fat was exposed, a foul odor emanated from the wound, and negative pressure wound therapy and surgical debridement were required. After debridement, the wound "appeared healthy and clean, however very deep." In late April, Glenn's appetite decreased, and he became "extremely somnolent." During this time period, Glenn was moved to different rooms multiple times, but Darlene was not kept informed of his whereabouts despite her repeated requests for that information. Darlene also repeatedly complained to physicians and nurses that Scripps's hospital staff was not adequate to meet Glenn's needs.

By the end of April 2009, one of Glenn's physicians decided to change his hemodialysis access by inserting a central catheter so that Glenn could move to a rehabilitation facility. After completion of the procedure, he was transferred to the facility on May 2. The staff there was "overloaded," and none of the nurses seemed to know anything about Glenn or his condition. Due to inadequate care at the rehabilitation

---

[2] Calciphylaxis "is a serious, uncommon disease in which calcium accumulates in small blood vessels of the fat and skin tissues. People who have this condition usually have kidney failure and are on dialysis or recently had a kidney transplant. Calciphylaxis causes painful skin ulcers and may cause serious infections that can lead to death." (<http.www.mayoclinic.org/calciphylaxis/> [as of Dec. 26, 2013].)

4

facility, Glenn developed a fever and hypotension, became "almost comatose," and had to be returned by ambulance to Scripps's hospital on May 4.

Glenn's condition deteriorated over the next month. He developed "non-stop diarrhea," and the tube inserted in his rectum "leaked terribly." Glenn's pressure ulcers worsened and became infected by antibiotic-resistant bacteria. Hospital staff failed to cover some of his wounds, did not position him properly, and left him "fully exposed to anyone passing his room." At the end of May 2009, Glenn developed a fever and hypotension, and was transferred to the intensive care unit. He died of septic shock on June 5.

## II.

## PROCEDURAL BACKGROUND

Darlene sued Scripps for damages and other relief based on its allegedly improper treatment of Glenn. In her initial complaint, Darlene asserted multiple counts, including, as relevant to this appeal, counts for violations of the Act and for willful misconduct. In those counts, Darlene alleged that Scripps intentionally, willfully, or recklessly staffed its facilities inadequately; consciously placed Glenn's person and health in danger; recklessly failed to monitor Glenn's condition, and to provide medications and equipment needed to treat him in a timely manner; and thereby caused Glenn to suffer physical and mental pain and other injuries and, ultimately, to die. Scripps demurred to those counts. (Code Civ. Proc., § 430.10, subd. (e).) The trial court ruled Darlene had not adequately alleged any conduct constituting reckless neglect or willfulness and sustained the demurrer with leave to amend.

5

Darlene then filed a first amended complaint, reasserting counts for violations of the Act and for willful misconduct, among others. Although Darlene made some minor modifications, the general factual allegations and the allegations of the counts for violations of the Act and for willful misconduct were substantially the same as the corresponding allegations of the original complaint. Scripps again demurred to the counts alleging violations of the Act and willful misconduct. The trial court ruled Darlene did "not allege sufficient facts showing [Scripps's] conduct was anything other than medical negligence. To the extent [Darlene was] attempting to allege neglect, there [were] no facts showing any such neglect was reckless or done with oppression, fraud or malice." The court therefore sustained Scripps's demurrer and again granted Darlene leave to amend.

Darlene next filed a second amended complaint, the pleading at issue on this appeal. She asserted for a third time counts based on violations of the Act and willful misconduct, among others. This time, Darlene expanded the general factual allegations to include much greater detail about the many deficiencies she perceived in Glenn's care at Scripps's hospital, as described in part I., *ante*. The allegations of the counts for violations of the Act and for willful misconduct remained largely the same as in the prior two pleadings. Scripps demurred to those counts a third time. The trial court ruled: "The allegations against [Scripps] relate to the rendition of professional services and although the [s]econd [a]mended [c]omplaint may allege inadequate care by [Scripps], it does not allege 'neglect' under [the Act]." The court also ruled that in her count for willful misconduct, Darlene had alleged no facts "to show [Scripps] knew of the peril to

6

be apprehended and consciously failed to act to avoid peril." The court therefore sustained Scripps's demurrers, but denied leave to amend, noting that Darlene's prior two attempts to cure the defects in her pleadings had been unsuccessful.

Darlene subsequently filed a voluntary dismissal of her other counts. The court then entered a judgment of dismissal against her and in favor of Scripps.

III.

DISCUSSION

Darlene contends the trial court erred in sustaining Scripps's demurrers to her counts for violations of the Act and for willful misconduct because she "has more than adequately alleged distinct facts establishing egregiousness of conduct, neglect and abuse." Alternatively, Darlene contends that if "more 'egregiousness' needs to be shown," she should be given a third opportunity to amend her complaint. As we shall explain, we disagree with both contentions.

A.     *Standard of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an

7

abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment."  (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 (*Aubry*).)

B.     *Demurrer to Count Alleging Violations of the Act*

Darlene contends the trial court should have overruled Scripps's demurrer to the count alleging violations of the Act because her "second amended complaint more than adequately describes specific acts comprising egregious neglect and abuse."[3] (Capitalization and boldface omitted.)  We disagree.

As relevant to this appeal, the Act authorizes the award of certain enhanced remedies (attorney fees, costs, and damages for predeath pain and suffering) to a plaintiff who proves by clear and convincing evidence both that a defendant committed neglect against a dependent adult who died and that the defendant acted with recklessness, oppression, fraud, or malice in committing the neglect.  (Welf. & Inst. Code, § 15657, subds. (a), (b).)[4]  The Act defines a "dependent adult" as a California resident between

---

3     "There is a split of authority on whether the [Act] creates an independent cause of action or merely provides additional remedies for some other cause of action."  (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 403, fn. 6 (*Carter*).)  We need not decide this issue, however, because even if we assume the Act creates a separate cause of action, Darlene's allegations do not state a claim against Scripps for neglect of a dependent elder.  (*Ibid.*)

4     The enhanced remedies are also available in cases of physical abuse of a dependent adult committed with recklessness, oppression, fraud, or malice.  (Welf. & Inst. Code, § 15657.)  The Act defines "physical abuse" to include assault, battery, assault with a deadly weapon or force likely to produce great bodily injury, and certain sex crimes; "[u]nreasonable physical constraint, or prolonged or continual deprivation of food or water"; and improper use of a physical or chemical restraint or a psychotropic

the ages of 18 and 64 years "who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights." (*Id.*, § 15610.23, subd. (a).)[5] The Act defines "neglect" as the "negligent failure of any person having the care or custody of . . . a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (*Id.*, § 15610.57, subd. (a)(1).) Such neglect includes failure (1) "to assist in personal hygiene, or in the provision of food, clothing or shelter"; (2) "to provide medical care for physical and mental health needs"; (3) "to protect from health and safety hazards"; and (4) "to prevent malnutrition or dehydration." (*Id.*, § 15610.57, subd. (b).) In short, neglect means "the failure of those responsible for attending to the basic needs and comforts of . . . dependent adults, regardless of their professional standing, to carry out their custodial obligations." (*Delaney v. Baker* (1999) 20 Cal.4th 23, 34 (*Delaney*).) Thus, when the medical care of a dependent adult is at issue, "the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care," and includes "the egregious withholding of medical care for physical and mental health needs." (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 783, 786 (*Covenant Care*).)

---

medication. (*Id.*, § 15610.63.) Although Darlene has accused Scripps of "abuse" of Glenn, she has not alleged any conduct constituting "physical abuse" within the meaning of the Act. Rather, she appears to have used the term "abuse" generally to refer to any conduct that violates the Act. We thus treat her count alleging violations of the Act as based solely on "neglect."

5    Glenn qualified as a dependent adult within the meaning of the Act because he was 45 years old when he died, lived in San Diego County, and was so disabled in an automobile accident that he could not work or manage his day-to-day affairs.

9

To recover the enhanced remedies available under the Act for neglect of a dependent adult, a plaintiff must allege more than simple or even gross negligence in the defendant's care or custody of the dependent adult. (*Delaney*, *supra*, 20 Cal.4th at p. 32; *Carter*, *supra*, 198 Cal.App.4th at p. 405.) The plaintiff must plead facts establishing the defendant's recklessness, oppression, fraud, or malice in the commission of the neglect. (Welf. & Inst. Code, § 15657.)[6] Thus, to withstand a demurrer, a plaintiff alleging neglect of a dependent adult must state "facts establishing that the defendant (1) had responsibility for meeting the basic needs of the . . . dependent adult, such as nutrition, hydration, hygiene or medical care [citations]; (2) knew of conditions that made the . . . dependent adult unable to provide for his or her own basic needs [citations]; and (3) denied or withheld goods or services necessary to meet the . . . dependent adult's basic needs, either with knowledge that injury was substantially certain to befall the . . . dependent adult (if the plaintiff alleges oppression, fraud or malice) or with conscious disregard of the high probability of such injury (if the plaintiff alleges recklessness) [citations]. The plaintiff must also allege . . . that the neglect caused the . . . dependent adult to suffer physical harm, pain or mental suffering. [Citations.] Finally, the facts constituting the neglect and establishing the causal link between the neglect and the

---

[6]     "Oppression, fraud and malice 'involve "intentional," "willful," or "conscious" wrongdoing of a "despicable" or "injurious" nature.' [Citation.] Recklessness involves '"deliberate disregard" of the "high degree of probability" that an injury will occur' and 'rises to the level of a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it." ' " (*Carter*, *supra*, 198 Cal.App.4th at p. 405.)

injury 'must be pleaded with particularity,' in accordance with the pleading rules governing statutory claims."  (*Carter*, at pp. 406-407.)

Darlene's count alleging violations of the Act did not satisfy these pleading requirements.  As we shall explain, she did not plead with particularity facts establishing that Scripps denied or withheld goods or services needed to meet Glenn's basic needs, either with knowledge that injury was substantially certain to befall Glenn or with conscious disregard of the high probability of such injury.  (*Carter*, *supra*, 198 Cal.App.4th at pp. 406-407.)

In the second amended complaint, Darlene alleged many harmful failures she perceived in Scripps's care and treatment of Glenn.  Under separate headings of the general factual allegations, she chronicled the "development of [Glenn's] skin breakdown due to extremely outrageous failures of basic care," the "extreme failures in care regarding [Glenn's] dialysis," the "improper and excessive admission [*sic*] of painkillers and opiates," and "improper care during multiple moves between hospital rooms." (Capitalization, boldface, and italics omitted.)  Darlene later listed several separate "actions and/or inactions" by which she alleged Scripps "failed to provide care in connection with its custody of [Glenn]," including failing to place him on a proper mattress in time to prevent the development of pressure ulcers, failing to correct overmedication with painkillers and opiates, failing to dialyze Glenn properly with normal commercial equipment, failing to provide adequate nursing staff, failing to

11

communicate properly regarding Glenn's moves among hospital rooms,[7] failing to provide adequate nutrition, failing to protect Glenn's dignity and privacy, and failing to prevent infection and disease. In the general factual allegations, Darlene also described in great detail the injuries Glenn allegedly suffered as a result of Scripps's inadequate care (including the dimensions of his pressure ulcers and the color and texture of their exudates), and further alleged that Glenn died "as a result of [Scripps'] egregious failure and outrageous oversights in care." In the count alleging violations of the Act, Darlene incorporated the general factual allegations and additionally alleged that in caring for Glenn, Scripps "willfully" or "recklessly" caused Glenn to suffer "pressure ulcers, pneumonia, infection and sepsis," as well as "humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, culminating in his tragic and premature death."

Other facts alleged in the second amended complaint indicate, however, that Scripps treated Glenn's medical conditions and otherwise provided for his needs, or at least attempted to do so. With respect to the pressure ulcers, Darlene alleged Scripps started to turn him every two hours shortly after admission, placed him on a bariatric bed within two weeks, and treated the ulcers medically and surgically. As to dialysis, Darlene alleged Scripps's nurses performed peritoneal dialysis, albeit with inadequate

---

7    Although we gather from the second amended complaint that Scripps's failure to inform Darlene of Glenn's multiple moves among hospital rooms caused *her* great distress, we fail to see how it harmed *Glenn*. Only neglect by Scripps that caused Glenn to suffer physical harm, pain, or mental suffering would be actionable under the Act. (Welf. & Inst. Code, § 15610.07, subd. (a); *Carter*, *supra*, 198 Cal.App.4th at p. 409.)

training and supplies, but eventually the proper supplies were obtained and Glenn was switched to hemodialysis. Other allegations indicate that Glenn was provided food, fluids, and medications; given a medication to counteract the effects of painkillers when he was oversedated with them; and transferred to the intensive care unit when he developed infections and other complications. Darlene also alleged that throughout Glenn's hospital course, she had multiple conversations about his condition with physicians and nurses, who then sometimes made changes to his care in response to Darlene's concerns, although not always as quickly as she desired.

Accepting as true the material allegations of the second amended complaint and giving it "a reasonable interpretation" (*Aubry*, *supra*, 2 Cal.4th at p. 967), we conclude Darlene has not alleged facts constituting neglect within the meaning of the Act. She has not pleaded with particularity any conduct by Scripps that constitutes "egregious withholding of medical care for physical and mental health needs" (*Covenant Care*, *supra*, 32 Cal.4th at p. 786) or "gross mistreatment in the form of abuse and custodial neglect" (*Delaney*, *supra*, 20 Cal.4th at p. 33). Rather, the allegations indicate Glenn was gravely ill when he entered the hospital; Scripps provided medical, surgical, and custodial care in an attempt to meet his needs; but, due to inadequate and poorly trained staff and untimely intervention, Scripps was unable to prevent Glenn's condition from steadily deteriorating to the point of death. Although such allegations might state a claim for professional negligence (see, e.g., *Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 113-114 [failure to prevent deterioration]; *Carter*, *supra*, 198 Cal.App.4th at p. 408 [untimely medical treatment]; *Bell v. Sharp Cabrillo Hospital* (1989) 212 Cal.App.3d

13

1034, 1050-1051 [inadequate staff]), they do not establish a violation of the Act because "the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care" (*Covenant Care*, at p. 783). The additional allegations that Scripps's conduct was "extreme," "outrageous," "egregious," "willful," "malicious," "oppressive," or "reckless" do not transform conduct that might constitute negligence into neglect within the meaning of the Act, for we do not accept as true such conclusory allegations when reviewing a ruling on a demurrer. (*Aubry*, at p. 967; *Carter*, at p. 410.) Accordingly, Darlene's use of such terminology did not cure her failure to state specific facts showing that Scripps's treatment of Glenn violated the Act, and the trial court correctly sustained Scripps's demurrer to the count alleging such violations.

At oral argument, Darlene contended the trial court should have overruled the demurrer because, under a liberal construction of the complaint in her favor, an inference of reckless neglect arises from the facts that Glenn entered Scripps's hospital with only a minor infection in his forearm, remained in the hospital for several months, and developed large pressure ulcers on his buttocks, which became contaminated by feces from a leaking rectal tube and thereby caused the sepsis from which he ultimately died. We reject this contention because it is inconsistent with basic pleading rules and the distinction between professional negligence and neglect under the Act.

Both the Act and cases interpreting it differentiate professional negligence from neglect. The Act itself excludes from its scope professional negligence claims: "Notwithstanding this article, any cause of action for injury or damage against a health care provider, . . . based on the health care provider's alleged professional negligence,

14

shall be governed by those laws which specifically apply to those professional negligence causes of action." (Welf. & Inst. Code, § 15657.2.) This "explicit exclusion of 'professional negligence' . . . make[s] clear the [Act's] goal was to provide heightened remedies for . . . 'acts of egregious abuse' against elder and dependent adults [citation], while allowing acts of negligence in the rendition of medical services to elder and dependent adults to be governed by laws specifically applicable to such negligence." (*Delaney*, *supra*, 20 Cal.4th at p. 35.) The Act thus applies when the reckless " '[f]ailure to *provide* medical care' " (*id*. at p. 34) or "the egregious withholding of medical care" constitutes the "gravamen" of the complaint (*Covenant Care*, *supra*, 32 Cal.4th at pp. 786, 790). (See *Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507, 1525 [gravamen of cause of action determines whether it is violation of Act or professional negligence].) The Act does not apply, however, when "acts of simple or even gross negligence" in "the *undertaking* of medical services" constitute the gravamen of the complaint. (*Covenant Care*, at pp. 785, 783; accord, *Delaney*, at pp. 32, 34; *Carter*, *supra*, 198 Cal.App.4th at pp. 404-405.)

Darlene attempts to avoid this crucial distinction by emphasizing the allegations concerning the "egregiousness" of the fecally contaminated pressure ulcers Glenn developed during his lengthy hospitalization and ignoring the many specific allegations that indicate Scripps did not recklessly neglect Glenn but actually provided him medical care. We are mindful that the allegations of a complaint must be construed liberally in favor of the plaintiff (Code Civ. Proc., § 452; *Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1238) and a "fact may appear by inference as well as by

15

direct allegation" (*United B. & T. Co. v. Fidelity & Deposit Co.* (1928) 204 Cal. 460, 465).  But in determining the legal effect of Darlene's complaint, we cannot focus on only the allegations she emphasizes; we instead must give the complaint a reasonable construction by reading it *as a whole.*  (*Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42; *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1386).  Darlene's complaint included numerous and detailed allegations indicating that although Scripps tried to prevent the development of pressure ulcers by repositioning Glenn every two hours and placing him on a special mattress, tried to heal the ulcers by medical and surgical treatments after they developed, and tried to treat his diarrhea by inserting a tube in his rectum, the ulcers became infected and caused the sepsis that led to Glenn's death.  These specific allegations that Scripps actually undertook to provide necessary medical care to Glenn but failed to prevent his death prevail over Darlene's conclusory allegations that Scripps recklessly neglected him.  (See *Stowe v. Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 422 ["Where there is any inconsistency between the specific allegations upon which a conclusion must be based and the conclusion, the specific allegations control."]; *Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 827 ["specific allegations control general pleadings"].)  Therefore, since the gravamen of Darlene's complaint is Scripps's "negligence in the undertaking of medical services" (*Delaney*, *supra*, 20 Cal.4th at p. 34), *not* its "egregious withholding of medical care" (*Covenant Care*, *supra*, 32 Cal.4th at p. 786), the Act does not apply.

We are not persuaded to reach a different conclusion by any of the cases on which Darlene relies.  Those cases involved wrongful conduct much more serious than that

16

alleged by Darlene. For example, in *Covenant Care*, the defendants allegedly admitted and discharged an elderly man suffering from Parkinson's disease to their facility without his consent, left him unattended in his own excrement for excessively long periods of time, deprived him of food and water so that he manifested signs of starvation and dehydration, and concealed his true condition from his children. (32 Cal.4th at pp. 777-778.) In *Delaney*, an elderly woman with a broken ankle was "frequently left lying in her own urine and feces for extended periods of time," and the nursing home's numerous violations of recordkeeping regulations prevented timely transmission to her physician of necessary information, despite "persistent complaints to nursing staff, administration, and finally, to a nursing home ombudsman." (20 Cal.4th at p. 27.) The other cases cited by Darlene also involved facts indicating the defendants denied or withheld necessary care or treatment with at least a conscious disregard of the probability of harm to the elder or dependent adult. (See *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 85, 87 [rehabilitation facility ignored care plan and did not document or notify physician of skin lesions of resident with genetic disorder that increased her risk of developing such lesions]; *Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 84-85 [Alzheimer's patient broke her hip when other patient pushed her and nursing home staff failed to intervene, and had to have leg amputated when staff failed to follow outside physician's treatment plan for pressure ulcers]; *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1067, fn. 13 [nurses did not bathe elder soiled by her own blood and feces, help elder to bathroom despite her incontinence, or brush elder's teeth to prevent fungal

growth].) As we have explained, however, no comparable facts are at issue here. The cases relied on by Darlene are therefore not on point.

C.     *Demurrer to Count Alleging Willful Misconduct*

Darlene argues the trial court should not have sustained Scripps's demurrer to her count for willful misconduct because she alleged "more than 'mere negligence,'" and "[f]acts have been alleged that are different and distinct from professional misconduct." We disagree.

As an initial matter, we note it is unclear whether there is an independent cause of action for "willful misconduct."[8] Some courts have stated it is not an independent tort, but merely an aggravated form of negligence. (See, e.g., *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 526 (*Berkley*)); *Morgan*, *supra*, 37 Cal.App.3d at p. 1011.) Others have asserted that "[w]illful misconduct means something different from and more than negligence, however gross." (*Colich & Sons v. Pacific Bell* (1988) 198 Cal.App.3d 1225, 1241; accord, *Porter v. Hoffman* (1938) 12 Cal.2d 445, 448; *Helme v. Great Western Milling Co.* (1919) 43 Cal.App. 416, 421.) This latter view is supported by our Supreme Court's statements that "[w]illfullness and negligence are contradictory terms. [Citations.] If conduct is negligent, it is not willful; if it is willful, it is not negligent." (*Donnelly v. Southern Pac. Co.* (1941) 18 Cal.2d 863, 869.) We need not decide whether

---

8      " 'Wilful or wanton misconduct' travels under several other names. Its aliases include 'serious and wilful misconduct,' 'wanton misconduct,' 'reckless disregard,' 'recklessness,' and combinations of some or all of these. These terms are interchangeable because they all identify the same thing . . . ." (*Morgan v. Southern Pacific Trans. Co.* (1974) 37 Cal.App.3d 1006, 1011 (*Morgan*).)

there exists a separate cause of action for willful misconduct, however, because even if we assume there is, Darlene has not adequately pleaded such a claim.

"Willful misconduct involves more than a failure to use ordinary care; it '"'"involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences."'"'" (*Carter*, *supra*, 198 Cal.App.4th at p. 412.) "Three essential elements must be present to raise a negligent act to the level of wilful misconduct: (1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril." (*Morgan*, *supra*, 37 Cal.App.3d at p. 1012; accord, *Berkley*, *supra*, 152 Cal.App.4th at p. 528; *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 360.) In addition, a "plaintiff asserting a cause of action for wilful misconduct must plead specific facts upon which the charge is based" (*Simmons*, at p. 361), "so that it may be determined whether they do constitute wilful misconduct rather than negligence or gross negligence" (*Snider v. Whitson* (1960) 184 Cal.App.2d 211, 214). Merely alleging defendant's conduct was willful, reckless, or wanton is not sufficient, because "[n]o amount of descriptive adjectives or epithets may turn a negligence action into an action for intentional or willful misconduct." (*Mahoney v. Corralejo* (1974) 36 Cal.App.3d 966, 973 (*Mahoney*).)

Darlene complains the trial court erred by sustaining the demurrer to her willful misconduct claim on the ground that she had alleged no facts "to show [Scripps] knew of the peril to be apprehended." Darlene contends she adequately alleged Scripps had

19

"actual or constructive knowledge of the peril to be apprehended" and "actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger." (*Morgan*, *supra*, 37 Cal.App.3d at p. 1012.) In support of this contention, she quotes the following sentence from her second amended complaint: "In light of [Glenn's] physical condition, extreme high risk factors, weight and limited abilities, [Scripps] knew, or should have known, that [its] conduct towards [Glenn] would expose him to peril, including physical and psychological injuries, and death." It may well be that the condition in which Glenn presented to Scripps's hospital was so dire that Scripps knew or at least should have known that he was at serious risk of injury or death if proper medical care and treatment were not timely provided. We need not decide the point, however, because even if we assume that Darlene adequately alleged the knowledge elements of a willful misconduct claim, she did not adequately allege conduct by Scripps that amounted to a "conscious failure to act to avoid the peril," as the trial court also ruled in sustaining Scripps's demurrer. (*Ibid.*)

Darlene based her count for willful misconduct on the same conduct by Scripps that underlay her count for violations of the Act. In fact, in her willful misconduct count, she specifically alleged that Scripps "[f]ail[ed] to ensure that [Glenn] was not subjected to acts of neglect as that term is defined under [the Act] . . . ." Darlene also alleged Scripps failed to hire competent employees, to monitor Glenn's condition adequately, and to provide him necessary medication and equipment. As we have explained, however, Darlene also included detailed allegations that Scripps actually provided (or at least attempted to provide) extensive medical, surgical, and custodial care, but was unable to

20

prevent Glenn's condition from gradually deteriorating to the point of death. The second amended complaint thus "does not present a picture of a defendant who harbors an intent to do an act with a wanton and reckless disregard of its consequences or who intentionally does an act with the knowledge that serious injury is a probable result. [Citations.] At the most, the defendant here could be said to have failed to exercise care—in brief, negligence." (*Mahoney*, *supra*, 36 Cal.App.3d at p. 974.) Further, although Darlene alleged that Scripps "consciously and willfully failed to act to avoid the peril," and "acted recklessly, and with deliberate indifference and conscious disregard for [Glenn's] safety and well-being," "'[n]o amount of descriptive adjectives[, adverbs] or epithets may turn a negligence action into an action for intentional or wilful misconduct.'" (*Carter*, *supra*, 198 Cal.App.4th at p. 413.) The trial court therefore correctly sustained Scripps's demurrer to the count alleging willful misconduct.

D.      *Denial of Leave to Amend*

Darlene contends she should be given a third opportunity to amend her complaint if "the actions and inactions already identified do not 'rise' to the level of 'despicableness' required." We disagree.

After a demurrer is sustained, a plaintiff seeking leave to amend has the burden to show how she can cure the defects in her pleading. (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742.) Darlene asserts she "can and will go into excruciating and gory details if required," by stating "who performed these neglectful acts, the precise time of the acts, further descriptions of the wounds, the infection, the feeding issues, the dates, times and amounts of painkiller administered, etc." But she already added "excruciating and gory

21

details" when she filed the second amended complaint (see pt. I., *ante*), and, as we have explained, those details did not adequately allege either neglect under the Act or willful misconduct. Adding even more such details would not change the legal effect of Darlene's pleadings. Moreover, although the trial court granted Darlene leave to amend twice, she failed to fix the pleading problems identified by the trial court. Under these circumstances, it was not an abuse of discretion for the court to deny Darlene a third opportunity to do so. (*Carter*, *supra*, 198 Cal.App.4th at p. 411; *Khoury v. Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 618; *Mitchell v. Franchise Tax Board* (1986) 183 Cal.App.3d 1133, 1137.)

## DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.

22